UNITED STATES BANKRUPTCY COURT'
EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| In re Toys "R" Us, Inc., et al.<br>Debtors. | Case No. 17-34665-KLP<br>Chapter 11<br>Jointly Administered |
| TRU Creditor Litigation Trust, Plaintiff, | |
| v. | Adv. Pro. No. 19-03087-KLP |
| UP Supply Chain Solutions Inc.,<br>Defendant. | |

### MEMORANDUM OPINION
(Amended to correct technical error only)

Before the Court are motions for summary judgment filed by the Defendant, UPS Supply Chain Solutions, Inc. ("UPS"), and by the Plaintiff, TRU Creditor Litigation Trust (the "Trust"). For the reasons set forth below, the Court will grant summary judgment to UPS and deny the Trust's Motion for Summary Judgment.

The Trust filed the complaint (the "Complaint") that initiated this adversary proceeding on September 16, 2019. In the Complaint, the Trust seeks the avoidance of certain allegedly preferential transfers and the return of $12,186,529.05, plus interests and costs.[1] On May 26, 2020, the Court denied the Trust's motion to dismiss the Complaint (the "Dismissal Motion"), finding that the Complaint met the requirements of Rule 12(b)(6) of the Federal Rules of Civil Procedure, Fed. R. Civ. P.

---

[1] The Trust bases the Complaint on § 547 of the Bankruptcy Code, 11 U.S.C. § 547.

1

12(b)(6), made applicable in this adversary proceeding by Bankruptcy Rule 7012(b), and had stated a claim upon which relief could be granted.[2]

The Dismissal Motion was based on UPS's assertion that it had been released from any Chapter 5 claims by virtue of a prior settlement agreement (the "Settlement Agreement") and the language of debtor Toys "R" Us–Delaware, Inc.'s[3] confirmed Chapter 11 Plan (the "Plan"). The Court determined that the question of whether UPS had been released was not ripe for resolution and indicated that UPS could raise the defense at the appropriate time.[4] With the filing of the summary judgment motions, the appropriate time has arrived.

The Court's May 26, 2020, decision on the Dismissal Motion addressed the Court's jurisdiction over this adversary proceeding and included a review of the relevant history of the case.[5] Those portions of the Memorandum and Order are incorporated herein by reference and made a part hereof.

STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), made applicable herein by Bankruptcy Rule 7056, the Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Fed. R. Bankr. P. 7056. The movant has the burden of establishing that there is no genuine dispute of

---

[2] *See* Memorandum Opinion and Order, AP ECF 27. All references to ECF entries in this adversary proceeding will be prefaced by "AP." Unless otherwise noted, all other references to ECF are to the Debtors' main case, 17-34665-KLP.
[3] *See infra* note 3 and accompanying text.
[4] *See supra* note 2, at 9.
[5] *Id.* at 1–6.

2

material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 321–23 (1986). When the moving party has met its initial burden, the burden then shifts to the nonmoving party to present specific facts demonstrating that there is a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (citing Fed. R. Civ. P. 56(e)).[6]

The Fourth Circuit has recently addressed the standard for summary judgment:

> To defeat summary judgment, however, a plaintiff must present sufficient evidence to allow reasonable jurors to find she has proven her claims by a preponderance of the evidence. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). To accomplish this task, a plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). Indeed, to avoid summary judgment, a plaintiff "must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013).

*Jones v. United Health Grp., Inc.*, 802 F.App'x 780, 781 (4th Cir. 2020). This standard has been applied to motions for summary judgment for both plaintiffs and defendants. *See, e.g., Penn. Nat. Mut. Casualty Ins. Co. v. River City Roofing, L.L.C.*, No. 3:21cv365, 2022 WL 626765 (E.D. Va. Mar. 3, 2022).

## UNDISPUTED FACTS

---

[6] The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Advisory Committee Note to 1963 Amendment of Fed. R. Civ. P. 56(e), 28 U.S.C.A.

Both parties have asserted that there is no disputed issue of material fact. Having reviewed the record, the Court finds the following facts to be both undisputed and material.

The Trust's predecessor-in-interest, Toys "R" Us–Delaware, Inc. ("Toys Delaware"), filed a Chapter 11 bankruptcy petition in this Court on or about September 19, 2017 (the "Petition Date"). Case No. 17-34669-KLP. After the filing, the Toys Delaware bankruptcy case was jointly administered with the cases of numerous other debtors (collectively, the "Debtors").[7] The lead case is Toys "R" Us, Inc, Case No. 17-34665-KLP, with the Debtors operating their businesses as debtors-in-possession.

Toys Delaware served as the operating company in the United States for the Debtors' businesses.[8] Toys Delaware also coordinated and provided various

---

[7] An order was entered on September 19, 2017, in accordance with Rule 1015(b) of the Federal Rules of Bankruptcy Procedure and Rule 1015-1 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Eastern District of Virginia directing joint administration for procedural purposes only of the chapter 11 cases of: Toys "R" Us, Inc., Case No. 17-34665-KLP; Geoffrey Holdings, LLC, Case No. 17-34660-KLP; Geoffrey International, LLC, Case No. 17-34666-KLP; Geoffrey, LLC, Case No. 17-34667; Giraffe Holdings, LLC, Case No. 17-34661; Giraffe Junior Holdings, LLC, Case No. 17-34662-KLP; MAP 2005 Real Estate, LLC, Case No. 17-34663-KLP; Toys "R" Us - Value, Inc., Case No. 17-34664-KLP; Toys "R" Us (Canada) Ltd., Case No. 17-34668-KLP; Toys "R" Us - Delaware Inc., Case No. 17-34669-KLP; Toys "R" Us Europe, LLC, Case No. 17-34670-KLP; Toys "R" Us Property Company II, LLC, Case No. 17-34671-KLP; Toys Acquisition, LLC, Case No. 17-34672-KLP; TRU Asia, LLC, Case No. 17-34673-KLP; TRU Guam, LLC, Case No. 17-34674-KLP; TRU Mobility, LLC, Case No. 17-34675-KLP; TRU of Puerto Rico, Inc., Case No. 17-34676-KLP; TRU Taj (Europe) Holdings, LLC, Case No. 17-34677-KLP; TRU Taj Finance, Inc., Case No. 17-34678-KLP; TRU Taj Holdings 1, LLC, Case No. 17-34679-KLP; TRU Taj Holdings 2 Limited, Case No. 17-34680-KLP; TRU Taj Holdings 3, LLC, Case No. 17-34681-KLP; TRU Taj LLC, Case No. 17-34682-KLP; TRU-SVC, Inc., Case No. 17-34659-KLP; Wayne Real Estate Parent Company, LLC, Case No. 17-34683-KLP.
[8] Disclosure Statement for the Second Amended Chapter 11 Plans of the Toys Delaware Debtors and Geoffrey Debtors (the "Disclosure Statement"), Art. II(A)(1). ECF 4543.

4

essential functions for certain international and North American operations, including store operations, and supply chain management. *Id*.

UPS is a service provider that, among other things, provided customs brokerage services to Toys Delaware pursuant to customs brokerage fee schedules. Ex. 1, Sherman Dep. at 61:3–62:2 (describing the Brokerage Schedules) AP ECF 116; Ex. 2, AP ECF 116; Ex. 3, AP ECF 116.

On the Petition Date, Toys Delaware owed UPS a total amount of $9,484,856.98 on outstanding invoices. Ex. D, AP ECF 104; Ex. E, AP ECF 104. Toys Delaware scheduled UPS as a prepetition unsecured creditor holding an unliquidated claim for an undetermined amount. Case No. 17-34669-KLP, ECF 5, Schedule E/F, p. 1470, Item 3.7305. As such, UPS was a creditor as of the petition date. Ex. 31, Trust Response to UPS, AP ECF 114, at 4.

On or about the Petition Date, the Debtors filed several first day motions seeking authority from this Court to, among other things, pay certain prepetition creditors as either critical vendors and/or critical shippers. ECF 6 and 14. Thereafter, the Court entered interim orders [ECF 81 and 84] and final orders [ECF. 708 and 723] (collectively, the "Critical Vendor/Shipper Orders") authorizing the Debtors, including Toys Delaware, to pay prepetition claims of certain critical vendors, including UPS.

By the middle of March 2018, UPS had been paid in full for all its prepetition claims. Ex. 1, Sherman Dep., 54:17–22, AP ECF 116. UPS also provided postpetition services to Debtors on credit. Ex. 31, Trust Response to UPS

5

Statement, AP ECF 114, at 7. By the end of April 2018, UPS had been paid all issued and outstanding invoices for postpetition services that had been rendered to that date. Ex. 1, Response to Statement of Undisputed Facts, AP ECF 112, at 28; Ex. 1, Sherman Dep., 134:22–135:10.

On April 3, 2018, the Debtors filed a Notice of Rejection of Certain Executory Contracts and Unexpired Leases (the "Rejection Notice"). ECF 2521 The Rejection Notice included the contract with UPS. UPS failed to assert any claim with respect to the rejection of the services agreement, nor did UPS file a proof of claim in connection with any prepetition claims. *See* https://cases.primeclerk.com/toysrus/Home-ClaimInfo (claims agent's website with respect to scheduled claims and proofs of claim and showing no filed proofs of claims for any "UPS" entity or any entity whose name includes the phrase "United Parcel").

In early 2018, the Debtors announced their plan to pursue an orderly wind-down and liquidation of their U.S. business and filed a motion seeking to wind-down their U.S. operations (the "Wind-Down Motion"). ECF 2050. At the time, administrative creditors held millions of dollars in unsatisfied claims. Transcript of Aug. 17, 2018, hearing, 143:10-144:2 (statement of Kenneth Eckstein, counsel for the Official Committee of Unsecured Creditors). ECF 4092. As part of the Debtors' wind-down, the Court entered an order authorizing the wind-down of the Debtors' operations and establishing administrative claims procedures (the "Wind-Down Order"). ECF 2344. Paragraph 33 of the Wind-Down Order authorized the Debtors

6

to notify vendors and service providers that the wind-down period services were covered by a wind-down budget, and the Debtors would be permitted to pay these obligations.  ECF 2344.

Paragraph 29 of the Wind-Down Order provided that the Debtors would file an administrative claims procedures motion seeking the entry of an administrative claims procedures order.  ECF 2344.  On May 25, 2018, the Court entered an order establishing an administrative claim bar date and providing for related notices and procedures (the "Administrative Claims Bar Date Order").  ECF 3260.  Section I, ¶¶ a–b of the Administrative Claims Bar Date Order provided that July 16, 2018, was the deadline for administrative claimants to file proofs of claim for administrative claims arising on or prior to June 30, 2018 (the "Administrative Claims Bar Date"), and provided creditors notice thereof.  *Id.* at Ex. 2.  Having been paid in full prior to the administrative claim bar date, UPS did not file an administrative claim.  htps://cases.primeclerk.com/toysrus/Home-DocketInfo, and https://cases.primeclerk.com/toysrus/Home-ClaimInfo (reflecting no filed administrative proofs of claim on the Debtors' claims docket or requests for allowance of administrative claims filed on the general docket in the Debtors' bankruptcy cases by UPS).

After the wind-down process commenced, various parties began investigating potential causes of action and working on a possible resolution of their pending

disputes.[9] On July 17, 2018, Toys Delaware and certain other Debtors filed a motion [ECF 3814] seeking approval of a settlement agreement (the "Settlement Agreement")[10] that granted releases of certain claims the Debtors' estates held against the Debtors' private equity sponsors and certain secured lenders, among others.[11] In turn, the Debtors' creditors (unsecured creditors, through the Creditors Committee, as well as administrative claim holders) would release their potential claims against the sponsors, the secured lenders, and the professionals and agreed to limitations on their rights to recover on claims against the Debtors' directors and officers.[12] Further, the Settlement Agreement provided up to $180 million to fund a partial distribution to the holders of certain allowed administrative expense claims against the Debtors.[13]

Under the Settlement Agreement administrative claim holders were permitted to receive distributions.[14] So long as these administrative claims holders did not timely opt-out of the Settlement Agreement, they were entitled to receive distributions from fund that had been established for their benefit, which was

---

[9] Most creditors, including administrative creditors, did not receive payment in full. Many administrative claimants were left with a limited amount of cash (exclusively funded with the proceeds of the settlement contribution made by secured creditors pursuant to the Settlement Agreement) and the right to contingent future payments tied to Trust recoveries. They are facing hundreds of millions of dollars in losses. *See* Plan [ECF 5746], Ex. A at Art. II, § A; Settlement Agreement [ECF 4083], Ex. 1 at § 3.1(c); *see also* Disclosure Statement [ECF 4543], at Art. IV. § A.
[10] The executed Settlement Agreement is attached to the order approving the motion. ECF 4083, Ex. 1.
[11] Settlement Agreement, § 3.4(b)(2)-(3).
[12] Settlement Agreement, § 3.4(a).
[13] Settlement Agreement, § 3.1(c)(1)(A)-(B).
[14] Settlement Agreement, § 3.1(c).

8

defined in the Settlement Agreement as the Administrative Claims Distribution Pool. Those creditors that did not opt out also received various releases from the Debtors and other parties.[15] In return, those claimants that did not opt out, including UPS, provided broad releases to numerous parties, including certain lenders, sponsors, and other parties from whom they might otherwise have pursued recoveries arising from the Debtors' financial meltdown.[16]

Section 4.1 of the Settlement Agreement provides that the settlement would become effective when the Settlement Order was entered. On August 8, 2018, the Court entered an order granting the Settlement Motion and approving the Settlement Agreement (the "Settlement Order"). ECF 4083.

The Settlement Agreement released:

> all Claims and Causes of Action arising under (a) chapter 5 of the Bankruptcy Code (including, for the avoidance of doubt, claims arising under section 502(d) of the Bankruptcy Code), or (b) any state-law equivalents of chapter 5 of the Bankruptcy Code, including state fraudulent conveyance laws and/or state any preference laws, against any non-insider pre- or postpetition creditors, whether or not they are eligible to participate in the Administrative Claims Distribution Pool (including, without limitation, vendors, suppliers, landlords, employees, and other creditors, each in their capacity as such) other than any Administrative Claim Holders that affirmatively opt-out of participation in the Administrative Claims Distribution Pool.

Settlement Agreement, § 3.4(b)(5). UPS did not affirmatively opt out of the Settlement Agreement. UPS Statement of Facts, AP ECF 104, at 2–3; Trust Response, AP ECF 111, at 6 n.3.

---

[15] Settlement Agreement, § 3.4(a), (b).
[16] Settlement Agreement, § 3.4(a).

On November 21, 2018, the Court entered an order (the "Confirmation Order") [ECF 5746] confirming the Fourth Amended Chapter 11 Plans of the Toys Delaware Debtors and Geoffrey Debtors (as amended and supplemented, and as confirmed, Ex. A to the Confirmation Order, the "Plan"). The Confirmation Order and Plan both provide for avoidance claim releases by the Debtors under the Plan, including Toys Delaware, providing that "[o]n and after the Effective Date, the Debtors waive, release and discharge any and all Avoidance Actions against . . . all Released Parties, and each avoidance Action Released Party." Confirmation Order, at Art. II. § O(b) ¶107, Plan, Ex. A, at Art. VII, § D, ECF 5746. The Plan's definition of "Released Party" includes "all Holders of Administrative Claims . . . ." Art. I, § A.154(j). Similarly, the Plan's definition of "Avoidance Action Released Party" includes "(a) any non-insider holder of a prepetition or postpetition Claim against the Debtors . . .." Art. I, § A.28(a). UPS was not an insider of the Debtors. UPS Statement of Facts, AP ECF 104, at 2; Trust Response, AP ECF 111, at 6 n.3.

The Plan became effective on January 20, 2019. *See* ECF 6247. UPS's postpetition claims were paid in full by January 15, 2019, prior to the Plan's Effective Date. Ex. 8, Sherman Dep. Ex. 10 (the "Small Claims Spreadsheet"), AP EFC 116; Ex. 9, Defendant UPS Supply Chain Solutions Inc.'s Amended Responses to Plaintiff's First Set of Requests for Admission, AP ECF 116 (the "UPS RFA Responses") (*see* responses generally and specifically responses to Request Nos. 1 and 20.)

ANALYSIS

10

As it argued in the Motion to Dismiss, UPS asserts in its summary judgment motion that all Chapter 5 claims the Trust may have against it, including the avoidance action set forth in the Complaint, were released by the terms of the Settlement Agreement. The Court's denial of UPS's Motion to Dismiss was "without prejudice to the right of the Defendant to raise the defense of release at the appropriate time . . . ." AP ECF 27, at 9. With the filing of its summary judgment motion, UPS is again asking the Court to find that it was released from the Trust's avoidance claims and therefore enter judgment in its favor and against the Trust.

If the facts and the law establish beyond dispute that UPS was released, then granting summary judgment in its favor is warranted. "[T]he burden of establishing [an] affirmative defense rests on the defendant." *Goodman v. PraxAir, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007). Thus, the burden is on UPS to establish that it was a Released Party as defined in the Settlement Agreement and Plan just as it is to establish that there are no material facts in dispute.

The parties agree that the law of the State of New York applies to the Settlement Agreement. Section 4.8 of the Settlement Agreement, "Governing Law; Jurisdiction" provides, "[t]his Settlement Agreement shall be construed and enforced in accordance with, and the rights of the Parties shall be governed by, the laws of the State of New York. . . ." New York law dictates that "[a] written agreement that is clear, complete and subject to only one reasonable interpretation must be enforced according to the plain meaning of the language chosen by the contracting parties." *Brad H. v. City of New York*, 951 N.E.2d 743, 746 (N.Y. 2011).

11

"[U]nder the normal rules of contract interpretation: words and phrases should be given their plain meaning and 'a contract should be construed so as to give full meaning and effect to all of its provisions.'" *Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp.*, 830 F.3d 152, 157 (2d Cir. 2016) (internal citation omitted). "Only when a court finds ambiguity in the parties' written agreement may it look to extrinsic evidence to discern the parties' intent." *Luitpold Pharm., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie*, 784 F.3d 78, 87 (2d Cir. 2015).

The Plan is silent as to its governing law. To the extent Virginia law applies, its governing principles are similar to principles of New York law. Under Virginia contract law, "[w]hen an agreement is plain and unambiguous on its face, the Court will not look for meaning beyond the instrument itself. However, when a contract is ambiguous, the Court will look to parol evidence to determine the intent of the parties." *Eure v. Norfolk Shipbuilding & Drydock Corp.,* 263 Va. 624, 632 (2002) (internal citations omitted); *accord Drake v. Franklin Equip. Co. (In re Franklin Equip. Co.),* 418 B.R. 176, 205 (Bankr. E.D. Va. 2009) ("Virginia courts have consistently applied the parol evidence rule to exclude extrinsic evidence except where an ambiguity is present."). Language in a contract "is ambiguous when it may be understood in more than one way or when it refers to two or more things at the same time. However, a contract is not ambiguous merely because the parties disagree as to the meaning of the terms used." *Eure*, 263 Va. at 632 (internal citations omitted).

12

The cases cited above are consistent. Whether the Court applies New York or Virginia principles of law, the standard is the same; if the operative language in a contract is plain and unambiguous, if reasonable minds would not disagree over its interpretation, and if the language cannot be reasonably susceptible to two different meanings, then parol evidence is inadmissible.

Having reviewed the record, the Court finds that the following facts are not in dispute. The Trust has commenced an avoidance claim under 11 U.S.C. §547 against UPS. UPS held, at various points in time, both prepetition and postpetition claims against Toys Delaware. UPS did not opt out of the Settlement Agreement or the Plan releases. It is not an insider of the Debtors.

Under the plain language of the Settlement Agreement and Plan, the Debtors released avoidance action claims against all "non-insider pre- or post-petition creditors" and any "non-insider holder of a prepetition or post-petition Claim" that did not opt out of the Settlement Agreement or the Plan releases. There are no temporal or other limitations in either document. Neither document, either directly or implicitly, limits the releases to creditors that held unpaid claims as of a particular date. Reasonable minds would not disagree over the interpretation of any relevant portion of the Settlement Agreement or Plan; neither is the language reasonably susceptible to two different meanings. In short, the operative language in both documents is plain and unambiguous.

The Trust maintains that the releases are limited to creditors that had unpaid claims "at the time those agreements went into effect and [that] would

13

suffer a loss in the Debtors' bankruptcy cases" (AP ECF 111, at 9-10) and asserts that UPS does not meet either criterion, having been paid prior to those "effective dates" and not having suffered a loss as a result of the Debtors' bankruptcy. The operative language, however, contains no such qualifications, either expressly or implicitly.

It is difficult to fathom how UPS, a creditor owed millions of dollars at the time of the bankruptcy filing and that also extended postpetition credit to the Debtors, could be neither a prepetition creditor nor a postpetition creditor. Reasonable minds would not disagree that a prepetition creditor is one whose claim existed at the time of the bankruptcy filing and a postpetition creditor is one whose claim arises after the filing. UPS clearly meets both criteria. It was owed money by the Debtors at the time of their bankruptcy filings, and it extended credit to the Debtors after their filings. Had there been an intention to incorporate a temporal or other limiting qualification into the Settlement Agreement or Plan to the effect that a creditor would only qualify for the releases if it did not ultimately receive full payment or if was owed money only at undefined points in time, the parties failed to address it. There are no expressed limitations, and imposing or including them would require the Court to ignore the plain meaning of the language of the Plan and Settlement Agreement.

Under the Bankruptcy Code, a "creditor" is an entity that has a claim against the debtor. 11 U.S.C. § 101(10)(A). A claim is a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, *contingent,*

14

matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."
11 U.S.C. § 101(5)(A) (emphasis added).  Section 101(10)(B) specifies that an entity with a "claim" against the estate of the kind specified in § 502(h)[17] is a "creditor." The prepetition receipt of alleged preferential transfers establishes a right to payment contingent on those transfers being avoided.  Thus, UPS had a contingent section 502(h) claim that made it a "creditor" under section 101(10)(B) of the Bankruptcy Code.[18]

---

[17] 11 U.S.C. § 502(h) states that "[a] claim arising from the recovery of property under section 522, 550, or 553 of this title shall be determined, and shall be allowed . . . the same as if such claim had arisen before the date of the filing of the petition."  The Complaint seeks a recovery under § 550.  See AP ECF 1, pp. 6-7.

[18] UPS contends that its contingent § 502(h) claim existed because it received payments in the 90 days before the Debtors' bankruptcy filing, a fact that has been established by the Trust's filing of the Complaint in an attempt to recover over $12,000,000 that was allegedly preferentially transferred.  Applying the Fourth Circuit's rule that the definition of "claim" should be interpreted broadly, *See L.K. Comstock & Co. v. Reibie (In re RailWorks Corp).*, 621 B.R. 635, 643 (Bankr. D. Md. 2020) ("Courts traditionally interpret the term 'claim,' as defined in section 101 of the Code, broadly."); *Dubois v. Atlas Acquisitions LLC (In re Dubois),* 834 F.3d 522, 529 (4th Cir. 2016) ("By using the broadest possible definition, the Code contemplates that all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case, thereby providing the debtor the broadest possible relief." (internal citation omitted)); *Grady v. A.H. Robins Co.*, 839 F.2d 198, 200 (4th Cir. 1988) ("Congress intended that the definition of claim in the Code be as broad as possible, noting that 'the bill contemplates that all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy. It permits the broadest possible relief in the bankruptcy court.'" (internal citations omitted)), the Court agrees that UPS was, and is, a creditor by virtue of its contingent claim.  Consequently, the Court need not address when and if UPS held additional claims as a result of the Debtors' rejection of its services agreement or an administrative claim in connection with its postpetition services.
　　The Trust's position employs circular reasoning; it asks the Court to determine that UPS was not released because it was not a "creditor" at the time the Settlement Agreement and Plan became effective, but if the Trust succeeds in its avoidance action against UPS, UPS would unquestionably be a "creditor" by virtue of its then having a non-contingent §502(h) claim, thus entitling it to the release.  This paradox would not exist under UPS's interpretation of the Settlement Agreement and Plan.  In any event, the Court adopts the reasoning advocated by UPS and adopted by the courts in *Slone v. M2M Int'l (In re G-P Plastics, In*c.), 320 B.R. 861, 866 (E.D. Mich. 2005) ("in accepting [the preferential

15

The Trust, seeking to have summary judgment entered in its favor, argues that the Settlement Statement and the Plan unambiguously exclude UPS from the release provisions. Simultaneously, the Trust urges the Court to consider parol evidence, most notably the recollections of certain parties involved in negotiation the Settlement Agreement and Plan.[19] Having found that the language at issue is plain and unambiguous, this extrinsic evidence is not admissible and has no relevance.

The Trust also argues that, because UPS had already been paid at the time the Settlement Agreement and Plan became effective, UPS gave no consideration in exchange for the release. This argument overlooks the fact that the Plan also

---

payments], M2M became a creditor of the Debtor and, by virtue thereof, became a holder of an unliquidated, unmatured, and contingent right to the payment (i.e., a 'claim' for reimbursement) that G&P could have avoided during bankruptcy proceedings"), and *ResCap Liquidating Tr. v. Liebert Corp. (In re Residential Capital, LLC)*, No. 12-12020, 2015 WL 3507128 (Bankr. S.D.N.Y. June 2, 2015), and finds that UPS, having a contingent right to the payments that could have been avoided, was a creditor even though it received payment of its prepetition claim.

[19] Even if the Court were to find that parol evidence is admissible, it would not be persuaded by the Trust's offerings. At the hearing on approval of the Settlement Agreement on August 7, 2018, Debtors' counsel made statements consistent with the Court's understanding that the Chapter 5 releases were intended to cover all non-insider unsecured creditors. Debtor's counsel made the following statement: "All potential preference actions against unsecured creditors, including administrative vendors, are waived. And in the ninety-day period, as reflected in the debtors' schedules and statements, there were more than a billion [dollars] of transfers made to various parties, leading up to the filing of these bankruptcy cases." No. 17-34665-KLP, ECF 4029 at 9, Ex. R. Counsel for the Unsecured Creditor's Committee added: "[W]e also minimized the risk to the unsecured creditors to be sued, sort of to add insult to injury, to be sued for preference" and "if you want a release that the committee is going to support, you have to release all vendors, all unsecured creditors for preference claims . . . . And I believe that when we look back on this case, not having to have creditors in this court, five, six, seven years from now defending preference litigation is a benefit that we were able to bring to unsecured creditors . . . ." *Id.* at 145-147. From the Trust's perspective, this would, at best, establish an issue of fact precluding summary judgment for the Trust.

provided that the "Releasing Parties" (which included UPS since it did not opt out of the Settlement Agreement) granted third-party releases to numerous parties, including the prepetition secured lenders, the Sponsors, and the Unsecured Creditors' Committee. The granting of the third-party releases by UPS was consideration for its release under the Settlement Agreement.

## CONCLUSION

The Settlement Agreement, as approved by the Court, expressly released avoidance claims against all prepetition and postpetition creditors, other than insiders and holders of administrative claims that opted out of participation in the Administrative Claims Distribution Pool. Section 3.4 of the Settlement Agreement explicitly releases any causes of action under chapter 5 of the Bankruptcy Code "against any non-insider pre- or postpetition creditors, whether or not they are eligible to participate in the Administrative Claims Distribution Pool (including, without limitation, vendors, suppliers, landlords, employees, and other creditors, each in their capacity as such) other than any Administrative Claim Holders that affirmatively opt-out of participation in the Administrative Claims Distribution Pool." This language is plain and unambiguous.

UPS was not an insider. It held both prepetition and postpetition claims against the Debtors, having extended credit both before and after the bankruptcy filings and having a contingent claim under 11 U.S.C.§502(h). It did not opt out of participation in the Administrative Claims Distribution Pool. These facts are sufficient to establish that UPS was released from liability for any avoidance

claims, including those set forth in the Complaint, and they are not subject to dispute. Accordingly, UPS has carried its burden of establishing its affirmative defense that it was released from liability to the Trust.

For these reasons, the Court will grant summary judgment to UPS and deny the Trust's Motion for Summary Judgment. A separate order will issue.

Signed: April 21, 2022

                                          /s/ Keith L. Phillips
                                  United States Bankruptcy Judge

Copies:

Entered on Docket: Apr 21 2022

Joshua David Stiff
Adam M Carroll.
Wolcott Rivers Gates
200 Bendix Road
Suite 300
Virginia Beach, VA 23452

Henry J. Jaffe
Kenneth A. Listwak
PEPPER HAMILTON LLP
1313 N. Market Street, Suite 5100
Wilmington, Delaware 19899-1709

James K. Donaldson
LimNexus LLP
919 East Main Street
Suite 1000
Richmond, VA 23219

Amber D. Shubin
Natalie Fleming Nolan
MORRISON & FOERSTER LLP
1650 Tysons Blvd., Suite 400
McLean, VA 22102

Theresa A. Foudy
Natalie A. Fleming Nolen

MORRISON & FOERSTER LLP
250 West 55th Street
New York, New York 10019

Case 19-03087-KLP    Doc 131    Filed 04/21/22    Entered 04/21/22 13:07:39    Desc Main
Document    Page 19 of 19